We'll hear argument this morning in Case 12-1146, Utility Air Regulatory Group v. the Environmental Protection Agency and the Consolidated Cases. Mr. Keisler? Mr. Chief Justice, and may it please the Court, the situation presented by this case is, to our knowledge, unprecedented in at least two respects. First, EPA agrees that if its interpretation of the PSD and Title V statutes is adopted, then applying other provisions of those same statutes would, according to their terms, would, in EPA's words, result in a program that would have been unrecognizable to the Congress that enacted it, and so contrary to Congress's intent that the agency calls it absurd. And second, EPA took that conclusion not as a reason to reexamine its interpretation, but as a basis for rewriting other provisions of the statutes that are clear and unambiguous, the numerical permitting thresholds that Congress enacted, because the agency wrongly believes that fixes the problem. And this is not a single, one-time act of statutory rewriting, as problematic as that alone would be, because the agency has said it intends to continually adjust and readjust thresholds into the indefinite future based on its ongoing assessment of the costs and benefits of regulation. I'm sorry. Can I ask about your interpretation of the phrase any air pollutant? Because there are a lot of different interpretations that have gone on among the various briefs and among the lower court opinions in this case. So here are some choices, all right? And I want really to ask you to pick what you're arguing for. Your original position was that any air pollutant meant any NAAQS pollutant for which the area is in attainment. That was your original position. Judge Kavanaugh's position is that it means any NAAQS pollutant. There's another position that goes on in the briefs that says, no, it doesn't mean any NAAQS pollutant. It means any local pollutant, whether or not it's a NAAQS pollutant. And there's still another position that says it's really any regulated pollutant other than greenhouse gases. So those are four different interpretations that all of the folks on your side, and I realize there are a lot of them, have presented. And I guess I'm asking you which one you're arguing for. Yes. I'm here on behalf of all the private party petitioners, and we have two arguments. Our principal argument, and the one I would like to focus on first, is that while other programs of the Clean Air Act give EPA authority to regulate greenhouse gases from stationary sources, PSD does not. And that is because, and this is where I would choose one of the options Your Honor gave me, and that is because the PSD program is exclusively focused on emissions that have area-specific air quality impacts and not on globally undifferentiated phenomena. Well, when you say area-specific, I mean, I take it that these sort of ozone pollutants are not area-specific. Would your interpretation exclude those as well? If the EPA couldn't make a regulatory finding that they had an area-specific air quality impact, yes. Could I ask you a follow-up to Justice Kagan? Now that's a fifth interpretation by your side. That, to me, is the quintessential ambiguity in a statute where we give deference to the agency. So if your side can't even come to one interpretation, why shouldn't we defer to the agency? Well, first of all, Your Honor, the deference that an agency is afforded is always going to be limited to reasonable interpretations. And we would start out with the premise that an interpretation that requires the agency to rewrite other provisions of the Act is not reasonable. Well, it hasn't rewritten them. All it has said, as I understand it, and I don't understand other than your view that there are too many people it's regulating, is that we can't implement it immediately because it would overburden us administratively. It hasn't said that over time, with streamlining and with other adjustments, that it can't do this. It's just said we can't do it right away. That's right, Your Honor. And that actually reflects a deeper problem. And I'd like to address that and then also explain why our position, we think, is the correct and only correct interpretation of the statute on the broader question. Before you do that, can you clarify whether or not you agree with the dissenting judges on the D.C. Circuit? That is, if we limit it to criteria pollutants, even so, BAC must be installed for greenhouse gases. You seem in your main brief to agree with that. You have a footnote saying it's BAC. That's a lot of differences. Eighty-six percent of the emissions on the government's theory, 83 on yours. But your reply brief seems to turn 180 degrees from that. And let me sort that out. And I recognize, Your Honor, that having six opening briefs isn't the most effective or most helpful way to the Court to present our position. So let me express on behalf of all the private petitioners, there are two arguments. Our principal argument, and the one I would like to focus on the most, is that greenhouse gases are not included within the PSD program at all. They can't trigger its applicability, and they wouldn't be subject to the best available control technology determination. But, again, that's because they're not local. Because they don't have area-specific air quality effects, yes. What do you make of the endangerment finding that greenhouse gases have severe effects at the local level? I think the endangerment finding is not before us today. The endangerment finding is that they exacerbate ground-level ozone and smog. Certainly, every effect that any environmental phenomena has on the planet, on people, will at some point be felt in some local area. Our point is that that is not the kind of measurable, area-specific, regionally-defined air quality impact that the PSD statute refers to. It's certainly not measurable. The agency doesn't even assert that it's measurable, right? That's right. And maybe it would help if I specifically identified there are three features of the PSD. I'm sorry. Before you do that, we have an outstanding question from Justice Sotomayor. Maybe. Thank you very much, Mr. Chief Justice. The problem is not simply that the agency rewrote the thresholds and said that it will eventually try, as it did say, to get down to the level of the statutory thresholds. Because the reason that Congress wrote those thresholds was because it wanted to exempt small entities from the costs and burdens of the permitting process. And so when EPA says that it hopes eventually to get down to the apartment buildings and large high schools that would be covered if those thresholds were applied to carbon dioxide, it is contravening congressional intent in another way. I didn't read them as saying that anyway. I read them as saying they'll try to do it, but make whatever exemptions are necessary. Well, and the problem is, Justice Scalia, that those exemptions violate the statute as well. The exemptions they're talking about, in order to deal with the small entities that Congress meant to exclude, would be to have general permits by category. And the statute specifically says that these determinations are to be case-by-case, followed by an individualized hearing. And so... It clearly is not a matter of the EPA simply saying, we can't do it right away, but we're going to do it eventually. That's right. It hasn't said that. It hasn't. And if they did say that, they would be violating the statute in worse ways. They would be treating a command by Congress not to regulate small entities into a command to regulate small entities. Mr. Kressler, do you really mean to say that the only difference between greenhouse gases and the air pollutants that Congress clearly had in mind when it enacted the Clean Air Act is that greenhouse gases don't have a localized effect? Isn't there also a big difference in that the quantity of greenhouse gases that are emitted by sources are much greater than the quantity of these other pollutants? And that's why there's this discrepancy between the statutory threshold and the threshold that EPA has substituted. That's right, Your Honor. And I think there are really two parallel problems that we're dealing with, each which creates its own need for the EPA to violate the statute in order to save it for greenhouse gases. One is the one that Your Honor and Justice Sotomayor were referring to, which is this was a statute designed for case-by-case permitting of a small number of large sources that materially contribute to the problem. And whether you rewrite the thresholds or promise to regulate down to the infinitesimal level, you are violating that aspect of the statute. But the other aspect of the statute, which is equally violated here, is the requirement that this particular program, not the other programs in the Act, but this particular program be focused on these area-specific air quality impacts. And there are three features, the three central features of the PSD statute, which we think show that. The first is Section 7471, which is, I think, on page 13A of the appendix to the government's brief. And that is the provision that specifies what the PSD program applies to and also explains what PSD, Prevention of Significant Deterioration, refers to. And 7471 says the program consists of emissions limitations and other measures, as may be necessary, to prevent significant deterioration of air quality in each region that bears certain designations. And air quality in each region is Clean Air Act language for that subset of air pollution problems that have regionally defined effects on the air that people breathe. How does this differ? I mean, there are many statutes, I believe, particularly in the regulatory area, where Congress passes a statute that tells the agency to do A, B, C, and D. And then it turns out, since there's so many of the regulated things, that it just doesn't make sense to apply A, B, and C, and D to all of them. So often, I would think, courts read in an exception where it makes no sense. For example, if there were a statute that said you have to throw out all bubble gum that's been around for more than a month, well, what about bubble gum used in a display case that nobody ever intends to eat? And so what we do all the time is we say, well, it doesn't mean to apply to that. Now, why can't we take the same approach, or EPA takes the same approach, here? It says 250 tons or more, and we apply that all over the place, except it doesn't make sense here. So we read an exception into it, unwritten, for places where it makes no sense. I don't know that there actually is a precedent in this Court which says the agency can do precisely what it did here, which is take an express command that identifies thresholds, that didn't delegate to the agency the determination of the thresholds, but says... I'm a little confused, because there have to be pollutants where it doesn't emit just 250, where it emits a million. And the best available control technology won't get it down to below 250, yet the PSD program is in effect when they get down below 250 on any pollutant of these six criteria. So it can't be your view that this statute was written only to get to measurable pollutants that are at 250 or can be brought below 250. That's right, Your Honor. It's not our position that the purpose of best available control technology is to bring facilities down to below the 250 level. It's our position that the statute sets that 250 ton per year level as the trigger, that a facility which has the potential to emit that or more. It's a minimum, but anything above it... That's right, anything above it. GHG is something that's above that, and it's never going to be brought down below it. That's right, but it's above it for millions of entities that Congress intended to exempt from the permitting process. And if I could just continue... If I could follow up really on Justice Breyer's question, because the conundrum here, you keep saying EPA is violating this specific statutory term, but the conundrum that this case raises is that everybody is violating a statutory term. EPA is saying, no, we can't do the 100 to 250 with respect to greenhouse gases, but you're also violating a statutory term. It says any pollutant, or it says in the other provision each pollutant subject to regulation. Nobody would think that the most natural, most reasonable readings of those phrases are any pollutant if they have localized effects, but not otherwise. So, I mean, what's happened here is that you have this new kind of omission that basically makes these two terms of the statute irreconcilable. And the agency has essentially picked one. It said, look, we're not going to just exempt a broad class of pollutants. Instead, we're going to fudge the numbers. And why isn't that the more reasonable of the two things to do? Because we don't agree, Your Honor, that those two forms of the dilemma that Your Honor described are equally situated. Certainly, 100 and 250 tons per year is a clear and unambiguous congressional command. The question of how to interpret the phrase air pollutant, that is an issue that is not a reasonable interpretation. Well, I think I don't really understand that. I mean, it's true that one is a number, but the other, each pollutant subject to regulation, or any air pollutant, what the EPA has done is for 30 years, across presidential administrations, treated those phrases as meaning a single thing, which I think if you put aside the absurdity problem in this case, everybody would agree is the most reasonable interpretation of those phrases. And you're saying the EPA should junk that most reasonable interpretation of those phrases because there's a new kind of emitted chemical, or whatever, that makes the numbers not work. No, let me go as much beyond the numbers, Justice Kagan. I think if anybody were looking at the PSD statute in isolation without the benefit of Massachusetts versus EPA, assume that the word pollutant was an undefined term, and the question was what pollutants does this provision of the CLEAN Act refer to, they would conclude that it refers to pollutants only that have those area-specific air quality impacts. And it's not only that the prevention of significant deterioration referred to in the statute is the deterioration of air quality in each region. It is also two other features of that statute which we think make that unambiguously clear. The first is section 7475E, which can be found on pages 27A to 29A, I think, of the government's statutory appendix. And that mandates the one analysis that has to be conducted in every permitting process, and the one analysis that Congress has required be available to public hearing. And that is an analysis of the air quality and local conditions at the site of the facility and each area that is going to be affected by the emissions. Counsel, you began that discussion by saying putting Massachusetts versus EPA to one side. But I was in the dissent in that case, but we still can't do that. No, that's... That's right, Your Honor, and I think it is our... My question is assume, and it's the case, that we're bound by both the result and the reasoning of Massachusetts and EPA and the American Electric versus Connecticut case. Under your view, what regulatory force, what regulatory significance do those cases have under, A, your approach, and B, the approach by the Chamber of Commerce and the Blue Brief? I think that may be consistent with the subject the Chief Justice just opened. Sure. Let me begin with Massachusetts versus EPA, and then I'll turn to AEP versus Connecticut. Massachusetts versus EPA did not hold that the interpretation of pollutant in that opinion had to be applied every time the word pollutant appears in the Clean Air Act. The same day that Massachusetts came out, this Court decided environmental defense versus Duke, in which it specifically said that even when a defined term in the statutory definition provision is construed a particular way, that doesn't mean that that same term used elsewhere in the statute can't be construed differently where context requires. And the Court reversed the Fourth Circuit for holding that they had to be the same. And that's why in Massachusetts, after indeed holding that the definition of pollutant unambiguously in its literal sense included greenhouse gases, the Court didn't stop there. It went on to ask whether applying that definition to the Title II provisions on motor vehicles that were at issue in that case would produce what the Court called extreme measures or counterintuitive results. And only after finding that there'd be no extreme or counterintuitive results did the Court direct the EPA to apply that definition to those Title II provisions. And I think what that reflected was that the Court understood that the literal definition of pollutant was sufficiently broad that it shouldn't be mechanically applied, plugged in everywhere in the Act that the word pollutant appears without some additional analysis of the context of those provisions. What else does it cover other than Title II, other than mobile vehicles? There are multiple places in which the word pollutant appears in the Act in which the EPA has understood the EPA the way I just described in which they have interpreted the words any air pollutant to mean only a subset of the pollutants that the definition literally That's generally because the section that it's in gives a different definition directly. With respect, Your Honor, that's not correct. So, for example, in the PSD and Title V provisions, it says any air pollutant. The EPA has interpreted that to mean any regulated air pollutant, not because of any separate definition but because of context. The context suggests otherwise. Same thing with the provision on visibility impairing. But your answer is that they can be treated differently under different parts of the Act. Doesn't that contradict your earlier view that we can't change the statute? No, I don't think so, Your Honor, because it was an active interpretation in Massachusetts v. EPA of a particular term. And the question is, reading that decision as a whole, what import did the Court give that interpretation? It would not have needed to go on and say, let's look at specifically the Title II provisions at issue here and ask whether it will produce extreme or counterintuitive measures if it weren't the case that that was an additional part of the inquiry that was necessary. And what other programs, I asked earlier, is it so we have the mobile vehicles? What else? You're saying it excludes PSD. What else does it include? I think most critically, Your Honor, it includes the new source performance standards program of Section 111 that this Court discussed in Connecticut v. AEP. And this is a very important point, because this case is not about whether EPA can regulate greenhouse gases from stationary sources. This Court held that it could under this program in Section 11. This is about whether state and local permitting authorities, the 90-plus state and local permitting authorities, are supposed to regulate plant-by- plant under this particular PSD program. And I mention the NSPS program because the features of that program highlight what's wrong here, because the NSPS program doesn't contain the elements of the PSD program that require the PSD program to be rewritten in so many particulars to make greenhouse gases fit. NSPS doesn't have the 100 and 250 ton-per-year thresholds. It lets EPA, by notice and comment rulemaking, decide what categories of sources are most contributing to the problem and most require regulation. It doesn't require the area-specific local impact analysis of subsection E of 7475, which EPA has told state and local permitting authorities, even though it's mandatory, don't conduct it because it can't be done for greenhouse gases. NSPS permits the EPA to look at reducing the national footprint without regard to area-specific impacts. And it permits the EPA to do this through a nationally uniform emission standard that the plants can then determine how best to meet, rather than asking 90 state and local permitting authorities, which is what PSD is about, to decide plant by plant what they think each plant in their jurisdiction should do about local permitting. So in your opinion, I'm not sure what the statutory site is to the provision you're talking about. Is it 7411- That's right, Your Honor. So you're saying they could use 7411A and B to get to just the same place they are today? Yes, without- You don't see an objection. There must be some reason they didn't do that. They are doing it, Your Honor. Then I don't know what this case is about. It's a question of whether they do exactly the same thing under one provision or another provision. You agree with them that they could do it under the other one and we'd end up at exactly the same place. But it's not exactly the same thing, Your Honor. And it is the difference between having the EPA, through notice and comment rulemaking, establish a national emission standard and then the plants can deal with that incentive system in the best way they can and figure out how to meet it, versus this command and control PSC mechanism where 90 plus state and local permitting authorities are each having to decide on their own what controls they think each plant in their area should engage in in order to deal with global warming. It makes perfect sense to have 90 state and local permitting authorities addressing the area-specific air quality impacts of plants that are built in their states. Is there such standards with such modifications as   has to have a standard that the state or local authority deems appropriate? That's the language of 7411B. Right. Okay. So if this is the right program, why couldn't they copy it word for word into the rules and just put a different section number at the bottom? I know you'd have a preferred way to do it, but if they disagreed with you and they think this is the perfect program, why can't they do it? Because the statutory language and structure of the PSD program does not, we think, encompass these kinds of pollutants that have globally dispersed results and not area-specific impacts. And it's for the reasons that I've indicated. 7411, which says, sorry, 7471, which says that the prevention of significant deterioration is focused on deterioration of air quality in each region, the study required by 7475E, which is of local conditions, and the fact that this is assigned to 90 state and local permitting authorities. Is that your second point? I've been keeping a list here of points you have not been permitted to get to. One, you were going to discuss not just the Massachusetts case but the follow-on case to Massachusetts. You never did that. Well, Connecticut v. AEP, and the only point to make about that is that that was the case which held that the commission, that the EPA has authority under Section 111, the NSPS provision, to address greenhouse gases without having to rewrite thresholds by designating the categories of sources like it's trying to do here. But it has to do it by national emission standards through notice and comment rulemaking. Connecticut v. AEP certainly did not approve the PSD provisions here, certainly did not approve the regulations rewriting the statutory thresholds that the EPA had to promulgate. The other thing, you were going to give two points and you only got to what is it, 74-11E, but there was another point. Yes, there were three features I mentioned of the PSD statute which we think make the context clear. You got the first, which was the which was 74-71, prevention of significant deterioration. The second was that study, that the only required study is of local conditions and area-specific impacts. And the third is just that this is assigned to 90 state and local permitting authorities, which is not, it is not plausible to think that with respect not to these area-specific impacts, but to a global problem like global warming, that what Congress was doing was saying we think 90 state and local permitting authorities should make those decisions rather than perhaps EPA on a national level. Just to be clear, your reading would say that the agency was not permitted with notice, an opportunity to be heard, to say, to make a criteria and make this a criteria of pollution, an AQS. If the agency had tried to establish a NAAQS for greenhouse gases, we think that would be contrary to the statute because the national ambient air quality standards are all about regional concentrations. Is this area in or out of compliance? If the gas goes up to the atmosphere and is mixed there, either the whole country is going to be in attainment or the whole country is going to be out of attainment. It doesn't work at all with the NAAQS structure. If I could reserve... Why don't you take an extra five minutes and we can begin by answering the question. You know, the government disaggregates the discussion and their first point in their brief is that greenhouse gases can be regulated with respect to sources that are already covered by the PSD program. That position does not implicate your concern about the broad reach of EPA regulation, does it? I think it does, Your Honor, because while that might deal with the specific issue of rewriting the thresholds, the fact that the PSD provisions, for the reasons I've indicated, is limited to area-specific air quality impacts, would we think be violated merely by applying best available control technology to a globally dispersed substance like greenhouse gases? I understand, but they would only be applying that with respect to sources that are already required to operate under PSD permits. That's right, but they would be applying it to a substance, greenhouse gases, which the PSD program was not designed to address, which was designed to be addressed by other programs. And I would say, Your Honor, that while they have tried to separate those issues out, that there's one issue about who has to get a permit, and the other issues about whether the requirements of best available control technology apply, the regulation that they have adopted to implement what they call their tailoring rule applies equally to both. What they've done is say that the words subject to regulation, which are the words in the batch provision, shall only apply to greenhouse gases, even when they're regulated, if you're emitting them at levels of 100,000 tons per year or more. When they did that, they both rewrote the provision that says who has to get a permit, and they rewrote the provision that says what best available control technology applies to. They did both at once, even though their brief treats it as separate. And if — I'm not certain how much time I have, Mr. Chief Justice. If I have — You have three and a half minutes left. Not including rebuttal? No, you'll get five minutes of rebuttal. Thank you, Your Honor. If I could then turn briefly to the second argument that I made reference to at the very beginning, which is an argument that need not be addressed if the Court is persuaded by what I've just said. But if not, we have a second, narrower argument, which is in the American Chemistry Council brief, which addresses the requirements for triggering the PSD statute. And our position on that is very much like Judge Kavanaugh's position below, which is that the statute is triggered only by emissions of major amounts of a pollutant for which the area is in attainment. But that's not Judge Kavanaugh's position. I thought Judge Kavanaugh's position is any NAAQS pollutant, all NAAQS pollutants. That's right, Your Honor, and that is the distinction. Our position is similar but not identical to his position. And it comes from a different portion of the statutory language. That's right. We are focused on language in any area to which this part applies. And that's because Part C, the PSD provision, applies not to an area as a whole, but for some pollutants and not for others in any particular area. Could I ask Mr. Kavanaugh why Judge Kavanaugh's argument has been left by the wayside? It is very similar, Your Honor, to the argument that we are making, but we get at it in a different way and with a slightly different result. Well, it does — it comes from different statutory language. His arguments about the structure of the statute don't apply to your argument. So I think, notwithstanding that there's some overlap between the arguments, the legal rationales are entirely different. And I guess I'm just curious. This is the argument we made below and it's the argument we've continued to make here. And the point of the argument — I think that answers the question. Excuse me, Your Honor? I don't think it answers the question, which is I know that's the argument. Are you saying you can't defend his argument or are you saying that — No, it's just that it's been hard enough to make two alternative arguments in this forum and to add a third to it would be more than I think I could handle. Can you clarify about — we have the NAAQS criteria. The EPA has added many others across the years. For 30 years it's been adding things for which there are no NAAQS. What about all of those? Your Honor, it is true that ever since 1980, although it proposed our interpretation as its original interpretation of the statute, ever since 1980, EPA has said that any pollutant, whether it's a NAAQS pollutant, whether it's a pollutant for which the area is containment, any pollutant would be sufficient to trigger PSP permit requirements. But that has had virtually no practical effect because all of those other pollutants, if they are emitted in threshold quantities, invariably — we've been able to find about two or three exceptions over 30 years — invariably the facility that is emitting them is also emitting 250 tons per year of one of the criteria pollutants. So this was a difference which made no difference until greenhouse gases came onto the scene. And with the Court's permission, I'll reserve the remainder of my time. Thank you, Counsel. General Mitchell? Mr. Chief Justice, and may it please the Court, there are at least two issues in this case in which EPA and the Petitioners agree. The first is that the term air pollutant cannot be given a uniform construction throughout the Clean Air Act, even after this Court's ruling in Massachusetts that air pollutant includes  of Title II. The second point of agreement is that greenhouse gases cannot be given a uniform construction throughout the Clean Air Act, even after this Court's ruling in Massachusetts that air pollutant includes air pollutants for purposes of the PSD and Title V programs, because the unambiguous statutory requirements of those programs are incompatible with sensible regulation of greenhouse gases. EPA thinks it can fix this problem by imposing an atextual, agency-created regime that applies only to greenhouse gases. The proper response, however, is for EPA to conclude that Congress never delegated regulatory authority over greenhouse gases in the PSD and Title V programs. Congress does not establish round holes for square pegs. And Brown and Williamson holds in these situations an agency cannot make a round hole square by rewriting unambiguous statutory language. General, I take it that the unambiguous statutory language that you're referring to is the references to 100 and 250. And it seems to me that that's an odd kind of term to drive such an important statutory interpretation question. Because what those numbers were all about is that they were supposed to separate major emitters from minor emitters. I mean, they were supposed to be about the size of the facility. They were not supposed to have, they were not supposed to make any distinctions as to the type of pollutant. So you're essentially using those numbers to make distinctions as to the type of pollutant rather than it seems to me a more sensible approach would be to say, look, the 100 and 250 numbers don't work for this new kind of pollutant. We're going to up the numbers and that will leave the rest of the statute and all the purposes of Congress intact. Justice Kagan, the reason we don't think the approach that you describe is permissible is because there are statutory provisions in the Clean Air Act that specifically forbid EPA to do what Your Honor is describing. 7661AA says that EPA cannot under any circumstance exempt any major source from the Title V requirement. And because that provision is in the statute, EPA cannot be claiming to seize discretion when Congress has specifically withheld that type of discretion here. This is akin to a dispensing power for EPA to be coming in and rewriting the Title V permitting thresholds in the way that they are. And the question to ask is whether the term air pollutant is flexible enough to accommodate different meanings in different statutory contexts. And here even EPA agrees with us that air pollutant can mean different things in different parts of the Act, even after Massachusetts. Massachusetts held that air pollutant unambiguously includes all things airborne, all airborne compounds of whatever stripe for purposes of Title II. But EPA has refused to carry over that definition throughout the Clean Air Act when the term air pollutant appears in at least three different places. One of them is Section 7411A4, which is part of the NSPS program. In that provision, the term air pollutant appears as part of the definition of modification. EPA does not interpret that to mean all things airborne. It doesn't even interpret that to mean all regulated air pollutants. It interprets that to mean air pollutants for which a standard of performance has been established. In the PSD and Title V permitting thresholds, EPA interprets the phrase any air pollutant not to mean all things airborne, but to mean any regulated air pollutant. And then finally, in Section 7491, EPA interprets the phrase any pollutant to mean any visibility-impairing pollutant. So if Massachusetts's all things airborne view of the phrase air pollutant is forced to be applied to every provision of the Clean Air Act where the word air pollutant appears, all of these long-standing EPA interpretations would have to be discarded. But, Daniel, if you look at what air pollutant means, and you put aside this whole absurdity question that the numbers get you to, you just say, what does any air pollutant mean? Does it mean what EPA has said it has meant for 30 years, which is any pollutant that's regulated under this Act? Or does it mean something more along the lines of your saying, which is anything other than greenhouse gases or anything other than pollutants that have particular localized effects? You would obviously choose EPA's version of the thing. And the only reason that you're not choosing that is because of these numbers that are in the statute, which were designed only, only, to distinguish between major and minor emitters. So if you can distinguish between major and minor emitters while keeping the completely sensible, long-standing  pollutant, why wouldn't you do that? Because I don't think it can be said, Justice Sotomayor, that air pollutant unambiguously means any regulated pollutant. That is a possible interpretation of air pollutant, but there are others, and EPA has adopted other definitions depending on the surroundings. Let me ask you a question. Assuming we agree with you that neither Massachusetts or Alabama, there's no statutory command to come to EPA's conclusion. What do we do? Do we just reverse them, or do we vacate and remand and tell them, no, you were wrong at step one? There is ambiguity in the statute. It's more than just that there's ambiguity, Justice Sotomayor. We're asking the Court to hold that a greenhouse gas inclusive interpretation of air pollutant simply does not fit with the unambiguous provisions of the PSD and Title V programs. Just as a tobacco-inclusive or nicotine-inclusive interpretation of the word drug was not able to fit with the unambiguous requirements of both. I think where Justice Kagan was going, and I will if she wasn't, but I think she was, is put the definition from 7479 in your mind. That means something to you, right? You know what I'm talking about. The definition of the major emitting facility. Right. Okay. Now we look at 7475 and it says you have to have a permit and use best available control technology. For what? Then we go to the definition and it says, among other things, for any source with the potential to emit 250 tons per year or more of any pollutant. Now that doesn't, my God, that maybe means every 500 people, every school is applied here. So you say we've got to use something about this statute because they don't really mean to every It doesn't mean every 500 people, like all my relatives are together, they have to have a permit. No, it can't mean that. So we have two choices. Choice A, which is what you would like, is it means any air pollutant, any regulated air pollutant, but not greenhouse gases. Okay. That's choice one. Choice two is it means any air pollutant including greenhouse gases but implicitly EPA has the authority to exempt small emitters. Which does the less violence to the statute? Choice one. I knew you would say that. The reason choice one does less violence is because the term air pollutant is flexible and has been acknowledged to be by EPA for decades and I think even by this Court, notwithstanding its holding in Massachusetts. It's permissible for an agency to construe ambiguous statutory language to avoid absurdity. In fact, it must construe the ambiguous language to avoid absurdity before taking choice two that Your Honor described where it rewrites unambiguous statutory language to avoid absurdity. If the simple choice were between construing one unambiguous statutory provision to avoid the anomalous results and construing another unambiguous statutory provision to avoid that outcome, then EPA would have a much stronger case for deference here. The problem for EPA is they've insisted for decades that air pollutant can mean different things in different parts of the country. Now you've modified my question. I get that answer on the language there. But if you had been sitting in Congress in the Senate Mr. Billings, I think was the staff person, Senator Muskie, and suppose that you had this choice put to you with your language we'd either like to have the authority implicit here to exempt the football team, the tiny emitters, or we'd like it not to cover it at all. Which do you think the Senate would have chosen in enacting this bill from the evidence in the language itself and the evidence which I look at, the history of the bill? I think they did make a choice, and it's in the language of the bill, that EPA does not have the authority to exempt any major source from Title V. They say that right there in Section 7061 AA on page 44 of the statutory appendix in the Social Security Act. Title V is not the PST requirement. Title V is just a record-keeping provision. That's true, but EPA... And so why should we exempt people from Title V? That's not what's causing the burden that you're talking about. It's just a record-keeping provision. But it's a very burdensome record-keeping provision, as EPA acknowledges. That's why they're not willing to impose it on every entity that emits more than 100 tons per year of carbon dioxide. It costs, on average, $20,000 to get a Title V permit and hundreds of man-hours. And it's plausible to impose those burdens, perhaps on large industrial sources, but certainly not to impose that on the corner deli or the Chinese restaurant of a high school building. So again, the... The first question, which would Congress have chosen? The choice was made in the statute to establish rigid numerical permitting thresholds that were defined not only by 100 tons and 250 tons per year, but also defined by a specific metric, and to withhold from the agency the discretion to depart from those unambiguous requirements. Instead, they provided looseness to the extent they provided it in the definition of air pollutant, which, even though this Court held in Massachusetts unambiguously includes all things airborne purposes of Title II, EPA has narrowed that construction in numerous other parts of the statute. If you can narrow it, why not narrow that one? Any air pollutant, including greenhouse gases, to the extent that they can be sensibly controlled under this statute. You know, I've worked with the words air pollutant. You see, I can do it any way you want if I'm prepared to read in exceptions, and of course, we do have exceptions when agencies enforce statutes. We do have exceptions from general language all the time. I don't think it would be a permissible act of statutory construction to say that carbon dioxide can be an air pollutant and not an air pollutant at the same time. You'd accept his definition, wouldn't you? You'd be happy with a definition that says air pollutant means any air pollutant to the extent it can be sensibly controlled under the statute. And you would say this one obviously can't. Right, which means it can't regulate it. It can, no, it can in large quantities. I mean, you don't see anything wrong with large quantities. It's just the small quantities you have a problem with. Are you saying it doesn't make sense to control major emitters of CO2? We're saying it doesn't make sense to construe air pollutant in a greenhouse gas inclusive manner for purposes of the PSD program because the unambiguous requirements require EPA to reach the small emitters. And if EPA wants to fix the problem, they can't resort to this form of agency self-help. General, one question is what would Congress have wanted given the obvious purposes of the Act, and that's an important question. Another question is what did the agency decide here? I mean, obviously this is the apex of Chevron deference. There's nothing that gets more deference than this agency with respect to this complicated statute. And given that this whole thing arises because there's this new kind of emission, which the numbers don't work for, which essentially makes these two terms in the statute irreconcilable, why isn't that a classic case for deference to the agency, that the agency gets to choose how to make the thing work as best it can when a changed circumstance makes it work not entirely the way Congress had foretold? I think because the Court rejected that very idea in Brown v. Williamson, where tobacco was trying to be regulated by FDA under a statute where the word drug clearly included nicotine if you just looked at the definition of drug in isolation. But this Court rejected FDA's assertion of jurisdiction by saying that the unambiguous requirements of the Food and Drug Act To accept your argument, we have to reverse Massachusetts. No, not at all, Justice Sotomayor. Well, you're saying that Congress didn't intend to control this pollutant. We said there that it did. No. The Court only needs to revisit Massachusetts if it believes that air pollutant must have a uniform, unambiguous construction everywhere it appears in the Clean Air Act. And not even EPA is making that assertion to this Court. And we've shown throughout how EPA has interpreted air pollutant differently. So there's no need to revisit Massachusetts at all to conclude that at least in the context of the PSD and Title V programs, it's not plausible for the agency to construe the phrase air pollutant to include greenhouse gases. The Court has no further questions. I yield my time back to the Court. Thank you, General Mitchell. Thank you. General Verrilli. Mr. Chief Justice, and may it please the Court, greenhouse gases pose the same threat to public health and welfare when they are emitted from a power plant as when they are emitted from the tailpipe of a car. And in American Electric Power, this Court said it was plain that EPA has the authority to prescribe general rules limiting greenhouse gas emissions by stationary sources like power plants. Yet petitioners say EPA lacks any authority to use the PSD permitting program to regulate the same emissions from the same sources causing the same harms. That's not a reasonable reading of the statutory text, and it is not a reasonable reading of the PSD program and the way it is supposed to operate in conjunction with the rest of the statute. Why would it be unreasonable to give EPA authority to regulate mobile sources and not authority to regulate stationary sources, given that stationary sources have to be licensed in this fashion, and it produces all sorts of other problems? It doesn't seem to be irrational at all. Well, the Court said, I think, that it was plain that Congress gave EPA the authority to regulate stationary sources in the American Electric Power case under Section 7411, and that, I think, gets to a fundamental premise where the petitioners are just wrong. Section 7411 and this relates to a question you asked, Justice Breyer, Section 7411 and the PSD program are not deemed at different problems. They're aimed at the same problem, and you can see that from the statutory text. For example, if one looks at Section 7475 A3, which you can find at page 21A of our appendix, you will see that in order to become eligible for a PSD permit, if you're a major emitting facility, you've got to, and if you're looking at Subsection 3, under 3A and 3B, you've got to show that you can meet all of the local air quality requirements of the NAAQS, those standards, and then C says you've got to meet any other applicable emission standard or standard of performance under this chapter, and that standard of performance language is not an accident. In 7411, the standards that are set, the nationwide standards that Mr. Kaiser was discussing for greenhouse gases or other air pollutants are called standards of performance, so this is specifically picking up the Section 7411 standard. Then if one turns to the definition of best available control technology under the PSD program, which you can find at page 34A of the appendix to our brief, you'll notice that Congress specifically linked the operation of the Section 7411 standards and the best available control technology under the PSD program. What this provision says, I won't belabor you by reading the lengthy provision, but what it says is that once Congress has set a standard under Section 7411, a nationwide standard, that becomes a floor for the evaluation of best available control technology. Are you reading Subsection 3, the A, B, and C, and you focus on C, any other applicable? Are you reading those in the alternative? I read that all three have to be complied with. Yes, all three have to be complied with. Then that doesn't help you because you're right back where you started. You have the tonnage per year requirement. With the absurd result that follows. Well, I'd be happy to get to that, but if I could just finish off this point about the connection between the operation of the two, because I do think it's of critical importance here, that what you're supposed to do under BACT is use best available control technology to get above the floor. The NSPS program sets those standards on every eight-year basis and the point of BACT is to force best practices to keep raising the bar during those eight-year intervals. And there's an additional point to be made about the relationship between the two. This goes back to Senator Muskie in 1977. The NSPS program was enacted as part of the 1970 Act. The PSD program was added in 1977 and it was added in 1977. And it was a satisfaction over both the pace and the comprehensiveness of the air pollution regulations that were being enacted by EPA under the 7411 standard. And it's because under 7411 EPA's got to go one source category at a time. It's got to do power plants and then it's got to do refineries and then it's got to do the next thing and the next thing and the next thing. And so EPA hadn't gotten standards in place for all the different sources. And the point of the PSD program is to make it so that when there is a standard under 7411, that becomes the floor and BAC says let's keep raising the bar. But when there isn't a standard under 7411, PSD is supposed to fill the breach. And it makes sense because you want to get the PSD program, remember, applies to new construction or major modification. The idea behind it is you want to get in there at the beginning when the source is first being constructed so that they don't lock in old pollution causing technology. They've got to meet best available control technology. About the best available control technology. I think I have an idea of what that looks like with respect to sources already regulated because they're relating to the NACs. Filters, scrubbers, all that. I'm sure it's oversimplified. But what does best available control technology look like with respect to greenhouse gases? Well, it's an evolving process, Your Honor, and there are now 140 or so permits that have been issued applying back to greenhouse gas emissions. There's some very helpful discussion of this kind of specifics in two places. The State Respondents Brief, pages 35 to 39, and the Calpine Amicus Brief. Calpine is a major utility. Right, but am I right because the greenhouse gases do not affect ambient air quality in a way that the current or the NACs provisions do? I mean, you're dealing with regulation of energy usage, right? As opposed to emissions of lead, emissions of the other NACs provisions. The main thing now is significant energy efficiency. For example, different kinds of turbines, different kinds of processes. The same sort of thing is for domestic use as the energy efficient light bulbs. Well, I really don't think this is about light bulbs, Mr. Chief Justice. No, but my point is that it relates to energy consumption as opposed to particulate emissions. At the moment, that's largely true. Not entirely true. There's some other technologies described. But of course, the EPA is considering and scientists are trying to develop additional control technologies like carbon capture technologies. And that's the whole point of best available control technology. As technology advances and better options come online that allow for even greater control of the pollutants, the statute requires that they be incorporated. That's how it's supposed to work. If you regulate I'm talking about your two distinct arguments in your brief. If you prevail on the first, in other words, greenhouse gases may be regulated with respect to sources that are already subject to permitting. My understanding is it gets you to 83% of the greenhouse gases. That's correct. Prevailing on the second argument gets you to 86%. That's correct. So this is a fight, putting aside your first argument, about an additional 3%. And yet, according to the petitioners, that brings in this huge regulatory problem of regulating the high school football game and whatnot. Just an aside on the high school football game. Human beings are actually net neutral on carbon emissions. And you'll need a chemist to explain that to you. But it doesn't matter how many family members you have, you won't get to the limit. But, with respect to the question, the lights at the game. The lights at the game, I don't think would be a problem either. But anyway, there obviously is, and the EPA has acknowledged, that there's a significant expansion of the permitting obligation under EPA's present understanding of permitting. But let me try to take this in two pieces, if I could. Let me first talk about why it's not just about the 3%. And then let me try to get back to Justice Kennedy's question, talk about the EPA's actually thinking and doing about that. The problem here is that the options, one of the problems, significant problem, is that the options that the American Chemistry Council have advanced and even that Judge Kavanaugh has advanced would require an invalidation of or at least a significant revision of EPA's 34-year understanding of the meaning of the phrase any air pollutant in 74791, which they have always interpreted to mean any air pollutant subject to regulation under the Act. You can't apply that 34-year long agency interpretation here and get to one of those results. You've got to change it. But a 34-year agency interpretation is not a statute. No, it's not. And you're saying, oh, rather than alter our 34-year interpretation, we're going to revise the provisions of the statute. I don't think that's a good trade. Well, with all due respect, I don't think that's what the agency's doing. And if I could just finish off this. The problem is that if you draw the line either at NAAQS pollutants versus all other previously regulated pollutants or if you draw the line at local pollutants but not global pollutants, you are going to knock out some sources that have been subjected to the permitting requirement previously. Can I ask you this question about EPA's position? Because this is something I don't understand. On the one hand, the EPA says that applying the statutory thresholds to greenhouse gases would transform the PSD program into something that would be unrecognizable to the Congress that enacted the program. Isn't that right? Yes, they did say that. On the other hand, EPA says, but that's what we're going to aim to achieve at some point down the road. No, that's a fundamental misconception, Justice Alito, and I would like to try to clear it up. And I'll try to answer Your Honor's question as well, Justice Scalia. What EPA's doing here is saying this is a transition. It's not a rewrite. And the goal of the transition is not to gradually expand the permitting requirement until they've got all the Dunkin' Donuts in America under it. That's not what's going on. In fact, it's the opposite. What they're saying is they're taking a look at the standards they use to decide who's eligible for a permit. They're looking to change those to the extent they can, consistent with their statutory authority and appropriate Chevron deference, to substantially narrow the numbers of people who will be eligible. Well, then they're never going to get to the statutory thresholds. I thought EPA said, well, we're going to work toward that. No, this is to try to get to the statutory thresholds. Well, let me give you an example of one of the main ways that... Well, that's that I don't understand their position. If applying the statutory thresholds makes the program unrecognizable, and yet that's what they're going to aim to do down the road, get to the statutory thresholds, will it become more recognizable at that point? Under the nuance there that I think answers your honest question is that the agency has discretion in deciding what constitutes the potential to emit 250 tons per year. What they have done historically is evaluate that on the basis of an assumption that it's facilities operating 24 hours a day... And then they'll be back down to 41,000 people falling within this, and when you get to number 5, Title 5, 6.1 million. That sort of changes what... I mean, if that's the question, does in fact this provision give the EPA the obligation to impose permit requirements on 41,000 businesses of a size that really are constitute at most 10 or 15 percent of the problem? Well, that's pretty hard to accept. But I thought what I thought the question was was whether EPA had the authority to implement this in a way that EPA itself thinks makes sense, which might be, on their own reasoning, to not impose permitting requirements on tens of thousands, perhaps millions of small businesses. I thought that was what the question was. It did seem to be the way they put it. It is, but I think the two things converge, Justice Breyer. They're trying to get to the point of saying that you won't have to apply... If you apply the standards EPA uses now, you sweep in all these people. And EPA says, well... Are they going to get some new standards that are these new... What the words they used in their opinion were streamlining. Right. What the words they used in their opinion implied to me when I read them, that they're never going to want to put tiny boilers onto this because it just doesn't do very much good and it's expensive to administer. That's how I read it. That's correct. All right. Then my question is back because this has been very helpful. I learned I'm not a net emitter of carbon dioxide. Believe me, because that means I'm a part of sustainable development. I thought... All right. So I've learned quite a lot from this. And I'd like to learn one more thing, which is... Look. 74-11. Remember what the Chief Justice just said about the 83% and the 86%. And even if you lose, they still can regulate 83%. And if you win, you can regulate 86%. And my goodness, if 74-11 is over there letting them do precisely what they want, why do you need this to? That's the part that I haven't got a clear answer to in my mind. So it's the reason I tried to suggest earlier, Justice Breyer, that the PSD program is supposed to work as a complement together with 74-11. For example, 74-11 now is being used, at least the EPA is contemplating, setting standards, greenhouse gas emission standards for power plants. That's a very significant contributor of greenhouse gases, but it's not the only one. There are refineries, there are other major sources... Put those all in. Write complicated standards. Write standards that have certain enforcement capacities and abilities. Write standards that require you to get a PSD permit. I mean, what's wrong with all that? They can do all that, but the problem is that that's going to take a lot of time. And that was the very reason Congress put the PSD program into existence in 1977, was because of the dissatisfaction, because of the time it took to go source-by-source, pollutant-by-pollutant, under the 74-11 program. I just want to make sure that I understood correctly. Under 74-11, you can require a PSD? No, you can set a national standard. Right. And part of the reason, as I said, I think it's just wrong to think about the PSD program as being, addressing a different kind of problem from the 74-11 program, is that you've got to meet the 74-11 standard in your PSD application. If I could actually get back to Justice Alito's question, because I've had a similar issue with what EPA did here. It seems to me it would be completely responsible and understandable if EPA had said, look, the 100 and 250 don't work with respect to this category of pollutant. Congress didn't know that this kind of pollutant was out there when it wrote those numbers. What it was trying to do was to distinguish between major and minor emitters. The new numbers are X and Y for this kind of pollutant. I understand that EPA may have felt like, oh, gosh, can we really do that? The solution that EPA came up with actually seems to give it complete discretion to do whatever it wants, whenever it wants to, and to be much more problematic than if EPA had just said, no, it's not 100 and 250, it's 10 times that. I take that point, Your Honor. I don't actually think that's what EPA was trying to do. I know it's been portrayed that way. I think they were trying to do the opposite. They're trying to say, well, let's look at how we define what it means to emit 250 tons per year and see if we can make that a more realistic analysis by going from the 24-7, 365-day-a-year hypothesis to figuring out how much this source is actually likely to emit, and you could drastically lower the number of sources who would be found to emit 250 tons per year. And that would bring, it would try to bring the system into line with the expectations that major emitters would be regulated. That's their objective here. Are greenhouse gases the only air pollutant for which EPA has the authority to change the statutory thresholds? Well, I'd like to make a point, if I could, about that. The real problem here is CO2. You actually, of the six greenhouse gases, the other five, you could use the statutory thresholds on without difficulty. It's the CO2 alone, really, that causes a difficulty. Could it do this for another pollutant, something other than any of the greenhouse gases? Well, I think in fairness, what EPA is saying here is that we've got an obligation under the statute to regulate. We've got an obligation to require a permit when there's more than 250 tons per year, and we've got an obligation to get the permits out within a year. That's also a statutory requirement. And that, just given the reality of the CO2 emissions, something's got to give. So I don't think it's that they're asserting authority to rewrite the statutory thresholds. They're dealing with a practical problem that's arisen under the immediate circumstances. One of the things that EPA said in the explanation of its rule is that EPA could say that PSD, or Title V, applies only to certain GHG sources. It's been suggested that that source would be carbon dioxide. It applies only to certain GHG sources and does not apply to the remaining GHG sources. But there didn't seem to be any follow-up on that idea. Well, the way to cure it is carbon dioxide doesn't work. Take it out. I think the reason, Justice Ginsburg, is because that is not going to make... The carbon dioxide is also a huge part of the problem, and so you're really not going to be getting to the heart of the problem at all. And there really is an urgency here, and that's part of what's driving EPA in this situation, of course, is understanding that this is an urgent environmental problem. It is the gravest environmental problem that we face now as far as EPA and EPA's judgment, and it is one that gets worse with the passage of time. The effects are cumulative and they're delayed, and so every year we wait, we make the hole deeper and we create an even greater threat to future generations. I'm sorry, I didn't get an answer to... hear an answer to Justice Alito's question, and I think it's an important one. There are currently criteria pollutants under the Act. Let's assume you find out that there's a particular substance that does cause harm to ambient air quality that is not already covered, and you publish a NAC for that. Can you decide that 100 and 250, you want to regulate at a different threshold, just like you have here? I mean, is this a particular assertion of authority only with respect to greenhouse gases, or does it cover any pollutant under the Act? Well, if you're going to use the NAC's approach and designate it as a NAC, as a NAC's pollutant, then you would be under the rules of NAC's pollutants and that would include this standard, but this is... Well, can you publish a NAC for greenhouse gases? I think it would be within EPA's authority to do so, but there are really significant problems with trying to regulate that way, and that's why... But it's important to understand, Mr. Chief Justice, that the PSD program applies to more than just NAC's pollutants. It's any pollutant subject to regulation under the Act. Okay, let's pick... There's a pollutant that isn't currently regulated, and science advances to the point where you think it should be regulated. Can you change the 100 and 250 threshold for that new covered pollutant? I guess what I would say about that is that if EPA found itself in exactly the same circumstances it finds itself in with respect to greenhouse gases, where it feels like the statutory definition compels it to regulate, it kicks in at 250, and you've got issue of permanent year that they could make a judgment comparable to the one they made here, but that would require that confluence of circumstances. Why? Why does it have to do that? Statutes all the time have implicit exceptions, and not every statute has such exceptions written in words into it. I mean, you know, it's a classic example, one after another. A statute that requires animals to pay 50% on the train does not apply to snails. Okay? I mean, that's the most common thing in law. So what's the big problem here with everybody seems to have, except me, Isabelle, I mean, what's the big problem with writing an implicit exception so that you don't regulate tiny little things, which no one normally wants to have regulated? Well, if the Court were to do that, that would certainly justify the EPA's judgment here, and that would be My problem is I will hear from many that what I would, perhaps it isn't a question of what I'd like to do, the question is, what does the law permit? And therefore, it's helpful if you can or others think of similar examples. Well, EPA has committed itself in this, in the regulations, in the rulemaking proceedings, to try to bring the 250 tons per year into alignment with the expectation that only large sources will be regulated. That's what EPA is committed to. It's General Verrilli, I don't have as expansive a notion of reading exceptions into a statute that are not there as Justice Breyer does, but assuming, just assuming that you can read exceptions. That isn't the issue here. The issue is whether you can read in exceptions unnecessarily, when the absurdity in question doesn't flow inevitably from the statute, when the statute can be interpreted another way that would not produce the absurdity. Aren't you compelled, where there is ambiguity, to adopt the interpretation of the statute that does not produce absurdity, rather than adopting the interpretation that produces absurdity, and then going around altering the provisions of the contract, of the statute? I mean, you take Justice Breyer's bubblegum example. Yes, I suppose, would you have to make an exception for bubblegum in the display window if the statute were subject to two provisions that would include display windows, and the other one of which wouldn't? It seems to me, of course, you would have to adopt the interpretation that didn't include display windows. And that's what's going on here. Yes, there's absurdity, but the issue is, how is that absurdity to be taken account of? By simply letting EPA rewrite the very clear numbers in the statute, or else by adopting a permissible interpretation of the statute, that does not lead to that absurdity. And I think that's quite a different question from what we've been discussing. Two points about that, if I could. First, that goes to the question of what triggers the permit application. It's only the expansion of the number of permit applicants that even raises this question of so-called absurdity. It doesn't go to the argument that the petitioners are making a far more substantial argument that EPA lacks any authority to consider greenhouse gas emissions under the BAC provision and other provisions, even for sources that have a permit for their emissions of non-greenhouse gases. So it only goes to the question of the scope of the triggering provision, not to EPA's authority to use PSB to regulate greenhouse gases for entities that are already subject to the permit for other reasons. Now, with respect to the trigger, what I would say about that, Justice Scalia, is that the statutory language is any air pollutant. Reading Massachusetts against EPA, the EPA came to the conclusion that that language necessarily encompasses greenhouse gas emissions. That conclusion is most consistent with the EPA's statutory obligations here because if the choices — you can say the choices between doing something sensible and absurd results, but really the choices between throwing up your hands with respect to what EPA considers to be the most serious air pollution problem we have, or trying to deal with the implementation problem that exists with respect to the emitters of about 15 percent of the sources. That's really the choice. General, wouldn't it be right to say that the rule that Justice Scalia is referring to only applies if there are alternative interpretations that are consistent with a legislative purpose? There have to be plausible alternative interpretations of the statute. And reading the phrase any pollutant to mean any pollutant except for greenhouse gases for reasons that have nothing to do with the purposes of the statute is not a plausible alternative interpretation. Wouldn't that be the argument? Yes, that's exactly the argument, and I think that's exactly what EPA did when it read Massachusetts against EPA and its understanding of air pollutants and thought about that in the context of the regulatory goals of this program. Of course, you know, the argument against that is no, that the statute evidences concern with ambient air quality and requires that to be measured. And the agency acknowledges that you cannot possibly measure the effect on ambient air quality of greenhouse gases. So it is not clearly compatible with the statute to bring greenhouse gases into regulation. And then the other is, I mean, this is quite I've got it focused now. It seems to me in my mind that we have two questions, and I think they were well stated by Justice Scalia, actually. The first is, what is the alternative interpretation that doesn't apply it here? And that would be an interpretation that doesn't put greenhouse gases within this PSD provision at all. And that might be really unthinkable. No, not unthinkable, but have worse consequences than worrying about the interpretation of this trigger provision. So either we have to do the one or the other. Either we have to interpret the trigger provision with flexibility so that there are unwritten exceptions in it one way or the other. Or we have to say, you can't do that and therefore they don't apply at all, which is worse. Have I got it wrong? I think that states it fairly. I think so. It depends on what you mean by unthinkable, General Verrilli. I think that was Justice Breyer. But what is supposed to be unthinkable, that greenhouse gases should not be regulated? Maybe that is unthinkable. But the issue is, is it unthinkable that Congress did not intend to regulate greenhouse gases when it enacted the current provisions of the statute? But isn't that the argument? Justice Scalia's alternative plausible interpretation of the statute might have been an alternative plausible interpretation of the statute pre-Massachusetts, but it no longer is. Isn't that right? That's certainly true, but it also, even before Massachusetts, there were significant problems with it. Here we have a statutory provision that has very specific numbers, and the agency has said, these numbers are absurd, we're going to multiply by 400. Now, in the entire history of federal regulation, what is the best example you can give us of an agency's doing something like that, where it has taken a statute with a number that has come out and written in the numbers that it likes? Obviously, I wouldn't characterize it quite that way. I don't have a case that's exactly on point. I think Morton v. Ruiz is a case that's like this in the sense that the agency had an obligation to provide something to a certain population, and it didn't have the funds that made it available to provide it to the whole population that was statutorily entitled, and it made the judgments it made to try to get the program to work. And if I could give you a hypothetical on that, Morton v. Ruiz. And if I could give you a hypothetical on that, if Congress enacted a statute that said that the customs authorities, border authorities, have an obligation to search every cargo container that comes into a port in the United States for radioactive materials, but no container shall be delayed more than three days, if an agency were faced with those kinds of obligations, and it didn't have the resources to get every container searched within three days, and it said, well, what we're going to do is search the containers that come from places where we think the risk is most likely, I think everyone would think that that's a reasonable interpretation of the agency's charge under the statute, and that's essentially what the EPA has done here. Just to be clear, you're not saying, or are you saying that if you're denied the authority you seek here, there can be no significant regulation of greenhouse gases under the Act? You're not saying that? No, I think, I want to provide some more specificity, though, in my answer, if I could. The Court has held in American Electric Power that the EPA has the authority to prescribe general national standards. Now, with respect to the PSD program, I do want to emphasize that there is a distinction between the question of what triggers your obligation to get a PSD permit and whether your emissions of greenhouse gases count as any air pollutant that triggers it, versus the situation in which if you are already subject to a PSD permit because you are emitting, say, a NAAQS pollutant or another one of the regulated pollutants, whether under Section 7574A4 you have to meet the best available control technology requirement, which is phrased in terms of a requirement for each pollutant subject to regulation under the Act. That's the 8386 question, right? That's correct, Your Honor, that's correct. And so I think those things are different and so there really are three points. There's 7411, there's triggering, and then there's if you're already subject to the permit. And the questions about whether the PSD program is limited entirely to pollutants that affect local ambient air quality, I just don't think that adds up at the end of the day. For one thing, EPA has been regulating since 1988 under the PSD program something called ozone depleting substances. We talked about this a little bit in our brief. Those are substances that have no local effects. They're substances that are released, they go up into the stratosphere, and they eat up the ozone and that then creates additional ultraviolet rays, which cause cancer and cataracts. Well, that has local effects. I mean, everybody knows that's smog in Los Angeles versus Montana, right? Well, if those local effects count, then certainly greenhouse gases have those kinds of local effects because they raise the sea levels, which cause flooding in certain places and they cause droughts in other places. And so the extent you're talking about local effects, greenhouse gases really aren't. Where have the sea levels risen other than Massachusetts? Well, certainly Massachusetts. With respect, EPA has been regulating ozone depleting substances since 1988. I see your argument Congress has acquiesced in that. Yes, in fact, we think in 1990 that they ratified it because in 1990 Congress undertook a very substantial amendment of the Clean Air Act. One thing they did was specifically address ozone depleting substances. They created a new Title VI for ozone depleting substances, so they were clearly focused on it. And they did not pull ozone depleting substances out of the PSD program at that time. They left them in, and that's significant because they did pull out hazardous air pollutants, which was another new category they created in 1990. I thought there was a very short time lag between EPA's assertion of the authority to regulate the ozone depleting substances under the PSD program and the enactment of... Two years. It was two years. Was it a full two years? I don't know if it was a full two years, but the Congress focused specifically on exactly how they were going to be regulated under the Clean Air Act, and they created a new... It's not an accident. They were focused exactly on how they were going to be regulated, so I do think it's quite a strong ratification argument. What's the... I know litigants hate this question. If you were going to lose... I knew you were going to ask me that question. So I actually think the Judge Kavanaugh approach is the ACC approach. We obviously were not endorsing this, but there's a significant difference between them, but... I've got another thought on that subject, which is, as I said to Justice Alito earlier, the whole problem in terms of expanding the permitting requirement is CO2, and so that if the Court were to say that any air pollutant can't be interpreted in the way that EPA has interpreted it at the trigger level to mean what we think it says, and what Massachusetts gets EPA-compelled, but if the Court disagrees with that, it seems to me that the answer that is least problematic from EPA's point of view is the least dissonant and causes the least risk of collateral consequences with respect to established regulatory programs which go beyond max pollutants under PSD, would be to say that you can't read any air pollutant to include CO2 because the inclusion of CO2 generates a permitting obligation that is out of accord with what Congress would have expected. I think... Well, what about BACT for CO2 then? Well, no, BACT would be, and that's just at the trigger, Justice Ginsburg, just at the trigger. We think that I just don't see, given that BACT says in unambiguous terms, in Section 7475 A.4, that anybody who's got to meet BACT for each pollutant subject to regulation under the chapter, meaning the Act, I just don't see how you can get out from under that. You've got to follow the plain text of the statute there. Well, if the command of the statute is that BACT applies for each pollutant subject to regulation. But the plan of the statute is 250 tons per year, too. And you've changed that to 100,000 tons per year. But I think... And you were going to get to 74, 75, 3, A, B, and C on that point. Well, 7475 3C also does say that if EPA does set a greenhouse gas standard for a particular stationary source, like power plants, then that becomes a condition of affirmation. That's what C3 says. And so between C3 and BACT, greenhouse gas, assuming that EPA acts under 7411, those, it seems to me, have to be in. This is a question about the definition of the trigger. Now, we don't agree with it, but in trying to faithfully answer Your Honor's question, that's what I think, that that's the equation. Your reading, or your suggested out, would mean that only the major facilities as defined now essentially would... Well, if you took CO2 out of the equation, I don't think the expanded scope of the permitting obligation is going to happen, because it's the CO2 emissions that expand the scope. And so that's why, you know, I'm not endorsing it. Justice Breyer said the difference between 83% and 86%, that 3% difference of who you're covering is thousands and thousands of people, or entities, I should say, not people, of institutions. Is that going to be the same under the reading that you have proposed? Pretty close, but I think the reason that we would, the reason that the exclusion of CO2 seems to me to be the least problematic is that EPA does have an established regulatory framework here that applies not just to NAAQS pollutants, but to the other non-NAAQS pollutants, sulfuric acid, mist, and the other things that EPA regulates under the PSD program, and you wouldn't be redefining the trigger to exclude those things which have previously been the rifle-shot solution to the extent that the Court thinks it's a problem. Wouldn't the proper answer be, if we are rejecting your entire position, to say there are these other options. We're not going to say take out CO2. We're not going to say adopt the Kavanaugh approach. We're going to say those are choices for EPA to make. Yes, certainly that's right. Certainly that's right. But I think the argument that as I read Judge Kavanaugh's opinion, and as I understood my friend's argument on behalf of ACC, was that the statute essentially compelled the conclusion that you had to pick one or the other of those alternative readings in order to avoid expanding the permitting obligation. And the problem with that way of thinking about it is that there are many other pollutants, non-NAAQS pollutants, that EPA has regulated for years and used as a trigger for years to require PSD permits, which you would be at risk of excluding from the program if you were to adopt the ACC or the Judge Kavanaugh reading as triggers. And that's a problem that it seems to me the Court ought to be thinking about trying to avoid. I have to say in reading the brief for the State, in reading your brief, I couldn't find a single precedent that strongly supports your position. Brown and Williamson I think is distinguishable for the reading set forth in the reply brief. What are the cases you want me to cite to break the opinion, sustain your position? At sustaining the argument that the trigger applies here, I do think there are a lot of cases. You're right. This is not a situation that arises very often. I think Morton v. Ruiz comes the closest. But that's not cited in your brief, is it? No, it's not, Mr. Chief Justice. That's true. It was cited and relied upon by the EPA in the rulemaking proceedings and rulemaking opinions. If I could just sum up here, EPA did what it did because the problem it's confronting is a problem that EPA considers to be urgent. Gentlemen, I don't want to interrupt your summation, but let me just ask this quick question. On the issue of what happens with a facility that is subject to the PSD program because of the emission of other pollutants, the petitioners argued that the permitting process would be entirely different for greenhouse gases because it would make no sense to require monitoring of local air conditions. It would make no sense to try to assess the effect of the emission of the greenhouse gases on the area in the region. Could you just give a quick response to that? I'm glad you raised that, Justice Alito. That's actually quite important. That's just not right. I mean, you think about it in multiple ways. There are multiple pollutants that are currently regulated under the PSD program. Some of them have national ambient air quality standards, and the local testing makes sense for those. Others don't have national ambient air quality standards like sulfuric acid mist, for example, and others. There aren't standards for those. And the way EPA has handled that, if you look at the regulations, the regulation says in terms of the monitoring that the statute requires, there's a specific exemption for substances that are otherwise regulated but for which there is no NAAQS or related standards. So they're just exempt from the monitoring requirement. There's also an analysis requirement, and what EPA has said and what the states do in their permitting processes with respect to the analysis requirement for the non-NAAQS substances, for example, sulfuric acid mist, is to apply a very simple idea. You're not trying in that situation to make sure that the particular emissions aren't having or are consistent with the overall ambient air quality level. It's a very simple calculus. More is worse, less is better. And so with respect to things like sulfuric acid mist, with respect to things like ozone depleting substances, that is how it has always worked at the state level under the PSD program. You just, you look at what the back emissions levels are, you try to get them down. And so you're not treating greenhouse gases any differently than sulfuric acid mist or ozone depleting substances or the others that don't have those requirements. And then in terms of wider effects, I mean, I would just remind the Court about the EMC Homer City case from just a few months ago. It's not at all unusual that the EPA would be regulating emissions in one place because they impose effects hundreds or even thousands of miles away. The pollutants emitted in Ohio or Kentucky contribute to the air pollution levels in New Haven or Bangor, Maine. That's what that case is all about. And so you regulate those pollutants also through the PSD program. And so you don't, you aren't in that situation looking just to see what happens in the local area. It's just never been the nature of this program. It's not, it just doesn't work that way. And if I could just remind the Court in conclusion why EPA did what it did, it's because this is an urgent problem. Every year that passes, this problem gets worse, and the threat to future generations gets worse. And I think faced with the obligations that EPA had, it made the most reasonable choice available to it. Thank you. You've got five extra minutes to be fair. And one thing You should have told me that before my summation. You'd already gotten going. You don't think that greenhouse gases should be regulated at the 250 tons per year level, right? I mean, you say Congress did not intend that, and it would be absurd. Yes, sir. So what level do you think they should be regulated at? In other words, what intelligible principle are you taking from the statute to say we're going to, we're at 100 now, we're going to aim for 50 or, in other words, if you had all the resources you need, what level would you pick as the proper one? Well, I think you'd want to look at the definition of what it means to emit 250 tons per year, and then you'd want to think about the underlying notion that what Congress is trying to do is to impose these obligations on facilities that are capable of responding to them, that are going to tend to be facilities that are major in quality, and that those are the things that are going to guide you in trying to figure out what the number is. And I think that is what EPA is trying to do. But I'm not sure I understand that. Would you pick the same class of emitters? Is that the number you would pick? I'm sorry, Justice Kagan, the same class of emitters as? As in the more typical emissions context, right? So 100 and 250 captures a certain set of emitters. Are you essentially looking for the number that captures the same class of emitters? I don't know that it'll be the same, but I think it'll be, but I think the class will be a lot smaller than the class under EPA's current understanding of what it means to emit 250. Well, how did the EPA summit settle on the number? They tried to explain that in one of the rulemaking orders, and I think what they did was try to figure out the right balance point where they were accomplishing very significant emissions limitations while not sweeping in sources that were a very large number of sources. So I think that's an incremental difference. What EPA did was say, essentially, we can get to 85 percent of the emissions we're trying to get to by setting the standards where we've set them. Why? Two things. One is you haven't said anything about the Title V problem, which they said was 6.1 million persons or individuals or businesses coming into it. So how do you get them out of that one? Well, I think the streamlining is the same idea. Why? And there would be a good reason for this, but the bell that it rang is that agencies have tremendous authority about how they distribute their enforcement resources. They don't have to enforce everything against everything, and that is a basic principle. They have to put their money where it will do the most good. And so why wasn't that? No one's really argued it. There would be a helpful point for us, but for this, and I will explain why we didn't, because there's a citizen suit provision in the law, and so that's what they'll tell you on the bottle. So I think that's the reason why, because it's subject to a citizen suit whether we exercise our privilege. In other words, you would be out of it totally, and any citizen could go bring a suit and say, where is your permit? Right. That's the problem. Yeah. Are there no further questions? Thank you. Thank you, General. Mr. Keisler, five minutes. Thank you, Mr. Chief Justice. You asked the Solicitor General what would that involve in this kind of situation, and I think Your Honor gave a perhaps absurd hypothetical about light bulbs. Your Honor should know that EPA's instruction to the state and local permitting authorities does address light bulbs in the cafeteria. What it says is that state and local permitting authorities likely, likely do not need to look at whether more efficient light bulbs should be used in a plant's cafeteria, because that would probably be not worth the burden in terms of the payoff. But the fact that they are talking about it at that level of detail just brings into sharp relief that this PSD process, when applied to greenhouse gases, which is about energy efficiency, not about adding technology to control the stuff that comes out of smokestacks, is pervasive in potentially affecting every aspect of an industrial plant's operation and asking the 90 state and local permitting authorities to decide what needs to be done. And that's what's so different between this and the NSPS program, which functions by setting emission standards that each plant can then So what do I do with the examples in the brief of the 144 permits that have already been given? People who have managed to come into compliance under that. Oh, and it's certainly not our submission that every single determination by every one of these authorities is going to be unreasonable or outrageous or is going to reach into the cafeterias, but it is that the scope of this is so different in nature and kind than the NSPS program, which would set efficient standards that people would be able to meet. And the second point I would like to make, Your Majesty, about what the agency considers ambiguous and unambiguous. It unambiguously is required to apply Massachusetts' definition of pollutant. But any air pollutant is ambiguous enough to accommodate any regulated air pollutant. But 100 and 250 tons per year, that's really ambiguous because it can mean 100,000. And I mention this because the selectiveness with which EPA has turned the ambiguity on and off so that in combination it maximizes the agency's discretion, shows that when we talk about what does the least violence to the statute, we have to think about it, among other things, along the parameter of separation of powers and whether the way in which the agency has proceeded here has arrogated an exceptional and troubling degree of discretion to design its own climate change program. And finally, with respect to the different definitions of pollutant, we've certainly proceeded here as if we are defining that particular word in the statute. But there is another way to think about the interpretive exercise here, and that is Brown and Williamson. Brown and Williamson started with the assumption that the definitions in the statute of drug and device encompass nicotine and cigarettes. But then it went on to say that giving the FDA jurisdiction under those programs over tobacco would be inconsistent with the regulatory structure that Congress enacted. And when it did that, it didn't go back to those definitions and say, we have to now figure out which word in that definition means something different than what we originally assumed. It said that the interpretation as a whole conflicted with the statute as a whole, and that was sufficient. We think the same is true here. The Court has no further questions. Thank you. Thank you, Counsel. Counsel, the case is submitted.